**AMS GROUP LLC**
138 Madison Street
Brooklyn, N.Y. 11216
Tel. 718 909-5942  Fax: 718 636-5164
Email: amsllc@aol.net

29

May 7, 2004

Federal Reserve Bank
33 Liberty Street, 23rd Fl, Complaints Division
New York, N.Y. 10045
Att: Ms. Muriel Payne

Dear Ms. Payne:

Our concern is with the Community Re-investment Act and ECOA and the systemic redlining, etc. which they were inaugurated to help cure, particularly where Minorities in energy and high finance areas are concerned ultimately, albeit not, perhaps, initially. It seems as though our entry into these areas was not contemplated at the inception of either CRA or ECOA, and our segregation from capital intensive markets continues.

We recently delivered the attached proposal to one of the largest banks in America, relative to the acquisition of a refinery as a Minority Owned and controlled business. The elements of our proposal included the attachments which indicate seriousness of purpose and a longstanding quest for participation in the energy sector of the U.S. economy from which Minorities have historically been excluded, a circumstance continuing to the present day, CRA and ECOA (Equal Credit Opportunity Act), for that matter, notwithstanding.

We believe that we were unfairly given a not-so-sophisticated brush off without there being a serious intention of giving our proposal a truly fair hearing that would include a review of our several alternative modalities of securing the proposed loan. Indeed, the treatment we received is best characterized as "reticent, enigmatic, capricious, truculent, arbitrary, and arrogant," exemplified by: "No use going back to the Executive office who'll just send you back to me. I don't have to tell you why. We just don't want to do it, that's all. Simple!" While we are under no illusions that any bank should violate the principles of safety and soundness, the prejudicial determination not to even hear of much less consider our alternatives, which we experienced, together with a refusal to provide any clues whatsoever as to any perceived deficiencies in our proposal lead us to wonder if very much has changed in the banking industry vis a vis high finance. We are left with the distinct sense that, at best, we might hope for a home mortgage or car loan, perhaps, but not a loan for the acquisition of a refinery, even though we bring highest quality banking struments to the table. The Vice President of this largest of banks stated flatly: "That's ⎯e way it's going to be!" when we protested the capriciousness, etc. he literally told us "Go to another bank". The first thing we were told when we rather naively --albeit idealistically!—invoked the Community Re-investment Act was that "we don't do refinery construction or acquisition with that [CRA]" "With what do you do them?. we asked. "We do them with normal loans or investments", we were told, whereupon we agreed to introduce more details of the proposed transaction whose underpinnings we also understood and agreed would naturally have to show there was no risk or that there was acceptable risk to the bank. Later, when I protested rejection: "But you said you do these loans." He answered: "Yes we do, but we're very selective." When I invoked "historical Minority exclusion from deals and the curative CRA"", his reply was that "I'm not going to shoulder history— I'm going to protect my company". That **almost** ⎯⎯⎯⎯⎯

But should not Minorities be as well represented in the energy industry as we are in Iraq and Afghanistan, and in Gulf War I, etc.  With open arms we are welcomed into the "energy industry" as soldiers, but our usefulness ends at the battlefront.  This Vice President petulantly and resolutely refused any feedback whatsoever as to what was lacking in our proposal and how it might be cured, while initially posturing as though he intended to give us a genuine appraisal; notwithstanding that we promptly delivered to him most cooperative Park Avenue investment bankers along with a complete professional "Summary Plan for the Acquisition and Operation of the 100,000 bpd Texas refinery."

Was this man right in assuming that there is nothing that can be done about the status quo?  Are they right that the Civil Rights quest and achievement of fair treatment in the banks as in the voting process and other vital areas of life are less worthy of pride than we thought? Are we deluding ourselves?    Does any spirit remain in Dr. King's "Dream"?

In his 4/25/04 appearance  on "Meet The Press" with Tim Russert, Prince Bandar Bin Sultan argued that OPEC's raising or lowering of the crude barrel price (as per Bob Woodward's allegation of an electoral deal) is not nearly so critical as declining U.S. trends of refining.  Since it is true that there is a downward trend in U.S. refining why are we not refining more, and while we are at it, why are not Minorities more fairly reflected in this vital sector of the economy, especially since we are not begging for a hand out, only seeking a secured loan with high quality banking instruments backing our endeavor?

**Pursuant to   ECOA and CRA which provide for relief from practices of discrimination in lending practices by U.S. banks, through protests of mergers and acquisitions  by such banks where redlining practices are in evidence, herewith, our request for relief as we protest the acquisition of Bank One by J.P. Morgan Chase scheduled for this coming June 2004, if the Executive Office backs the V.P. 100% as he claimed when he admonished us not to contact Chairman William B. Harrison, Jr. again, even for clarification.**

As detailed above  our experience with J.P. Morgan Chase evinced every characteristic of the odious practices which ECOA and CRA were created in order to cure.

We fully respect the principles of "safety and soundness" by which all lending transactions are bound to be governed according to ECOA and CRA.  It is the inscrutable response of the bank that troubles us, denying us as it does, a fair opportunity to present the various options available to us by which we could easily meet the criteria of safety and soundness. We believe that we were not fairly and honestly treated.  We never expected nor did we demand that our options be accepted unconditionally, only fair hearing and sound reasons.

However, the spirit of fairness convinces any person that a full hearing of the options is a minimal requirement for just the **appearance** of fairness and openness.  Additionally, the refusal to provide the smallest clues of the perceived deficiencies of our proposal compels us to think we never had a chance from the beginning only because of our race, for the simple reason that any objective, impartial witness and/or arbiter would admit that our project, though intensive in capital requirements, is extremely worthy, in the public interest, and well supported in financial terms.

Accordingly, we ask that you expeditiously take those actions prescribed by law whereby the inclusion of all people, regardless of race and ethnic background, may be assured.

Further, we notice that the Annual Report lags the CRA Performance evaluation by three months so that the bank is able to show lower "total deposits" to the Federal Reserve Board and then show company shareholders a higher, "rosier" deposit total with a "discrepancy" of one hundred forty eight billion dollars ($148 Billion).

These numbers should be synchronized so that the critical "loan-to-deposit ratio" would be less deceptive. ECOA regulation B Sect. 202.9a3 and 9(b)(2) were ignored in our case..

Also, this bank should be required to produce more Downstate statistics than it presently does for its MSA (Metropolitan Statistical data), as the numbers reflected in the September 2003 CRA Performance Evaluation are predominantly from Upstate New York, e.g., Buffalo, Syracuse, Albany, etc. African Americans and other Minorities are banking with this company with significant input, yet the output is measured in communities where we are not as heavily represented. Absurdly, there is about one (1) downstate point of reference and that is relative to 2 Chase Manhattan Plaza. Where are Blacks in energy and finance?

The CRA data should be delivered to the governors (FRB, OTS, FDIC, OCC) by the banks under the same constraints of certification by which Certified Public Accountants are governed. Our understanding from conversations with a FRB examiner is that they are not presently thus accountable. Again, ECOA regs. B Sect. 202.9a3 and 9(b)(2) pertain.

While the bank was conducting its charade, our 14 year quest and rare chance to own a refinery was lost we are advised by Park Avenue Equity Partners who granted "exclusivity" to competitors on 4/28/04. Thus, all of our Minority Business Enterprise opportunities are compromised, together with plans for inclusion in the larger economy.

Accordingly, please advise us of your intentions toward addressing this unacceptable circumstance of inequality in this bank where Minorities are concerned in the context of equal opportunity in energy industry enterprise and associated access to capital on the basis of safety and soundness. Right now the unwritten "code" says "Don't aim so high, safety or soundness or no safety and soundness".

Should the bank express a willingness to negotiate in good faith, we will consider withdrawing our protest of the scheduled acquisition of Bank One, and we will consider canceling our plans to sue for damages. Park Avenue Equity Partners advises that the "exclusive" arrangement of 4/'28/04 may soon expire, thereby restoring the lost opportunity to acquire the refinery. We have approached Citibank, N.A. to act as lender or guarantor; conversely, JPMC may act as guarantor; **alternatively we can explore alternatives in good faith**, but time is of the essence.

Thank you for your urgent attention to this matter.

Yours truly,

Donald C. Greaves
Associate Director

cc:   Mr. Anthony Robinson, Esq. President, MBEL-DEF
cc:   Mr. William B. Harrison, Jr., Chairman & CEO, J. P. Morgan Chase

Attachments