# EXHIBIT C

RECORD

_____CLOSED_____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____X

AMS GROUP LLC

- AGAINST -

JP MORGAN CHASE

_____X

07 cv 6988

**AMENDED COMPLAINT**

**And**

**DEMAND FOR JURY TRIAL**

Under penalty of perjury as set forth by United States Code, Plaintiff affirms all statements herein made are true:

1. AMS Group LLC is comprised of several energy industry veterans who (a) have secured a Letter of Intent from one of the majors for approximately one million tons (1,000,000) of diesel/heating (fungible) fuel annually; (b) delivered a one billion dollar ($1,000,000,000,00) Irrevocable Confirmed Letter of Credit to one of the major oil producing nations for the purchase of crude on term contract basis and held Municipal fuel supply contracts;(c) traded energy stocks on Wall Street

for 20 years; (d) delivered to ²Occidental International Exploration and Production Company (OXY) an OPL (Oil exploration block) containing three hundred million barrels (300,000,000 bbls) of crude petroleum, which has been producing 50,000 barrels of crude per day from 1996 to the present;(e) negotiated with the government of Vietnam for the acquisition of off shore oil exploration blocks in and bordering upon the South China Sea.;(f) Repeatedly demonstrated entrée and access to the highest levels of oil producing government officials; (g) Applied to a major oil producing nation for a long term contract to purchase crude petroleum as feedstock for a refinery to produce products ranging from gasoline, heating and diesel fuel to jet fuel (JP1a, or kerosene) and naptha and other distillates for commercial sale.

2. On March 16, 2004, AMS Group LLC applied for a loan from JP Morgan Chase for the purchase of a refinery in order to access a range of opportunities in the oil industry, both in the mainstream economy and in minority business enterprise opportunities found in General Services Administration, Department of Defense, National Aeronautics and Space Administration—numerous opportunities as set forth in the Federal Acquisition Regulations generally.

3. AMS Group LLC—that is to say, each of the members thereof, without exception—had been working extremely hard for many, many years toward the establishment of contractual relationships with crude petroleum sources—

and the acquisition of a refinery was a key, critical component of the Business Plan

4. AMS Group LLC had identified a prime³ candidate refinery for acquisition, of the capacity and cost that were perfectly suited to the company's needs in terms of barrels per day, logistics, affordability and availability. Such refineries are literally next to impossible to find as American Petroleum Institute, Ventech (world class refinery building engineers) and all such experts will testify.

5. Ventech will confirm that we sought eligible refineries in earnest through them. AMS Group LLC exhausted every resource, including word of mouth, to find a refinery to do the extraordinary business and access the rarest opportunity to share a crude petroleum acquisition contract. AMS Group LLC member(s) had a written agreement with the President of Ventech, world class refinery builders, for profit sharing in a related venture.

6. The refinery which AMS Group LLC had found was ideal at 100,000 bbls/day, Requiring capitalization at $135,000,000, including basic cost of $60,000,000 and retrofitting, sour tower conversion and overall maintenance and upgrade. The refinery was located at Pasadena, Texas, owned by Crown Central Petroleum. It was ideal in many regards—especially noteworthy being the facts that it was located in the U.S. Gulf, a deep water port perfectly suited to oil tanker dockage; it was a nexus for a pipeline system into which it was fully integrated; it had its own storage capacity up to four million (4 million) barrels of crude. AMS Group LLC had obtained the Deal Book from Park Avenue Equity Partners, pursuant to a Confidentiality Agreement, annexed hereto, signed in 2003.

7. AMS Group LLC worked extremely hard to align the following elements: (a) Crude

oil sources; (b) refinery availability; (c) $^4$ identification of at least 3-4 distinctly different and unrelated guarantor groups willing, able and ready to collateralize the subject loan and (d) a capable lending institution such as JP Morgan Chase and Citigroup N.A. which are subject to the Equal Credit Opportunity Act as well as the Community Reinvestment Act derived therefrom..

8. AMS Group LLC directed its loan application/proposal directly to the Executive Office, Attn: Mr William B. Harrison, Jr., Chairman/CEO, because of the level of finance involved and the need to quickly obtain an authoritative review and response in order to be timely relative to the fleeting opportunities and their mutually contingent relationships.

9. The Executive office delegated its authority to Mr. James Nicholas, Vice President of Auditing.which we did not look at with suspicion—although in retrospect that emotion, had it been indulged, was abundantly justified. At the inception of our contact with Mr. Nicholas, whose capacity as V.P. of Auditing, we interpreted to mean he was the best, the ideal person to evaluate the quality of banking instruments AMS Group LLC proposed to offer as security for the proposed loan; collateral to be provided as guarantee whereby the halcyon banking principles of safety and soundness would be safeguarded on behalf of J.P. Morgan Chase, its officers, the institution generally and, most importantly, the Shareholders.

10. The banking instruments, or forms of collateral offered to the bank for purposes of securing the loan, and thereby, in effect, indemnifying and holding harmless the Lending institution included one-year and multiyear (CDs) Certificates of Deposit, including "jumbo CDs", Bank Warrants, Bonds, LC's—in short, a full array of forms

of irrevocable collateral whereby the 5 loan was to be secured at de minimis risk to J.P. Morgan Chase. It was our greatest need and most intense desire to meet with and present samples and details of the proposed instruments and the several guarantors who made themselves available to accompany us to an in person meeting at J.P. Morgan Chase., wherein alternative modalities might be presented and fully detailed to the satisfaction of any expert which Mr. James Nicholas was, as we were made to understand from his title, Vice President of Auditing.

11. When, quite surprisingly, J.P. Morgan Chase strenuously and resolutely declined to meet with us even briefly, despite my earnest appeal, my associates and I, including guarantor(s) were deeply disappointed, since a loan application on the level which we proposed, we knew to normally merit at least a brief in person completely noncommittal meeting. Indeed, tea and crumpets are not uncommon to such meetings where such high finance is involved.

12. While he declined to meet with us, Vice President Nicholas did admit that J.P. Chase routinely supported construction and acquisition deals and he insisted on Receiving our delivery of financials on the refinery together with our description of the basic mechanics of the requested loan

13. AMS Group LLC accommodated Mr. Nicholas' standoffish attitude and approach and we complied with the bank's terms, notwithstanding yhe profound sense of disappointment, even signal rejection experienced by my colleagues who, knowing the banking industry intimately, were alert to the very negative signal being sent to us for no reason other than that we are Minority owned and controlled. We felt very

strongly that White businessmen in the [6] energy sector at these levels of finance are afforded a much different, friendlier, fair and objective quality of treatment.

14. Concomitant with their ongoing cooperation with our endeavors to align our finances with the refinery purchase opportunity, Mr. Scott Booth of Park Equity Partners requested we allow him to contact our prospective banker. He was being asked to prioritize his update of the financials and he required assurance that his usage of valuable time was justified. We therefore provided him with J.P.Morgan Chase's Vice President's name and contact information. Accordingly, JP Morgan Chase's V.P., Mr. Nicholas was contacted by the representatives of Crown Central Petroleum Corporation, to wit, Mr. Scott booth, of Park Avenue Equities Partners, Inc., 333 Park Avenue, Suite 3204, New York, N.Y. 10022, Tel. No. 212 430-0134 Fax: 212 430-0170 email: sjb@pkave.;com. It was crucial to show the refinery representatives that AMS Group LLC was a serious contender, given the fact that other interested buyers were also potentially closing in and, as it developed, actually closing in.

15. On or About 4/22/04 or 4/23/04, Park Avenue Equity Partners' Mr. Booth advised via Telephone, when we called to get his impressions of the bank's posture, that JPMC evinced no interest in lending relative to our loan application for the acquisition of the refinery. We regretted that Mr. Nicholas had expressed disinterest to the refinery representative prior to allowing us a heads up. We had ventured to allow the contact on the basis of the fair presumption that professional etiquette should have dictated that J.P. Morgan Chase would merely have responded to Park Avenue Equity Partners' enquiry with a simple: "We are reviewing their application

for a loan". (Supplementary Appendix [7] # P: and #R: Depositions of Mr. Nicholas and Mr. Booth relative to their telephone conversation about AMS Group LLC)

16. In our immediate subsequent contact with J.P. Morgan Chase we expressed no disappointment with the contact that had been made or the nature of it as Mr. Booth advised us of it; rather we sought only to learn directly from Mr. Nicholas what JPMC's decision was and we were told our proposal was under consideration and Mr. Nicholas promised to call in the next couple of days. Days passed, however, and he did not call as he promised, while we waited anxiously for a substantive response---the window of opportunity with Park Avenue Equity Partners/Crown Central Petroleum we knew to be fleeting.

17. Not only were we in danger of losing the refinery but we were in danger of missing the critical deadline for submission of an application for a crude oil contract which required the acquisition of a refinery by our joint venture partner, National Oil Company. We needed to back up our crude oil acquisition application with the financials of an existing refinery with which we could prove relationship as owners or, alternatively, we needed to provide National Oil Company with a processing agreement to qualify it, our JV partner, to contract for the purchase of crude to which AMS Group LLC would in turn have access for its intended refinery.

18. When JP Morgan Chase did not call after several days, we called Mr. Nicholas At 212            and were told: "We're not going to go forward with this." This and a subsequent conversation with Mr. Nicholas is recounted in detail. (See        Letter to Federal Reserve Bank, att: Ms. Muriel Payne,

Bank Examiner)

8

19. We were also deeply concerned that we had shared immensely vital details of our Business Plan and the refinery details which we were seeking to acquire and, accordingly, we sent a letter to Mr. Nicholas, reminding him of industry standards Vis a vis "Confidentiality". We were in near panic when our suspicions about the bank's insincerity became conclusively manifest in the context of our exposure of proprietary information about all phases of our operation under construction. We hoped to prevent leakage of our plans and concepts to competitors, inadvertently or advertently by the bank, as such occurrences are altogether common.

20. On 4/28/04, we received notification from Park Avenue Equity Partners' via email Which said: "We have entered into a 45 day exclusive arrangement relative to Crown Central Petroleum's Pasadena refinery". This was devastating.

21. We filed the above stated letter of protest with Federal Reserve Bank, complete with a carefully crafted last paragraph that offered conciliation and noncomfrontation, notwithstanding the probable permanent loss of the Pasadena, Texas refinery. We wanted to keep the hope alive that we could still acquire the refinery in the event the 45 day exclusive expired without consumation of a deal to buy Crown's refinery by our competitors. Additionally, although the loss of the 100,000 bpd Pasadena refinery was a major disappointment, it need not have been totally and incurably devastating, we reasoned, because there was one other refinery up for sale by the same Crown Central Petroleum Corporation, also represented by Park Avenue Equity Partners. The smaller refinery, La Gloria,

located at Tyler, though far less well [9] appointed re: pipelines and ocean access and storage capacity, it was newer and free of Clean Air Act/EPA issues and also labor problems were not associated with this refinery as they had been in the past with Pasadena refinery. Therefore even this refinery could have served our purposes and we wanted to keep the options open for J.P. Morgan Chase and ourselves as a positive consequence, prior negative experiences with JPMC, notwithstanding.

22. It should be pointed out that in March 2004, we had chosen JP Morgan Chase to approach for the Loan because of its capability—700 billion on deposit—and because we knew that it was planning an acquisition of Bank One, scheduled for June 2004 and the rules of the Community Re-investment Act provide for sanctions against a noncompliant bank in the form of protest to the Fed against Acquisitions/mergers by such a bank. We considered that "redlining" being what it is historically, it behooved us to approach only those entities that were appropriately large enough to entertain a loan at the level we needed and a bank which was also compelled to operate in good faith toward minority interests by the paucity of its experiences at dealing with minorities at this level. JP Morgan Chase was the only bank we could find that had these unique factors at work. Further, at least two of the members of AMS Group LLC had banked with JPMC for many years.

23. When we discussed this provision of sanction with Mr. Joseph Storace of Federal Reserve Bank, he advised back in April or May 2004 that such sanction was No longer an option because the acquisition of Bank One by JPMC had "already gone forward" and was a fait acompli.

24. Contrary to the erroneous statement by Federal Reserve Bank examiner

Ms. Muriel Payne, AMS Group LLC, <sup>10</sup> absolutely never at any time suggested, Asserted, implied that it was applying for the loan on the basis of "assets" or that its "revenue" or "assets" recommend it for a loan! Her July 2004 letter in paragraph_____ refers to JP Morgan Chase's inability to find any statements about AMS Group LLC "assets" or record of its existence by such investigative/reporting entities as Dun & Bradstreet. AMS Group LLC was formed in late 2003, had conducted no income producing operations yet and was under no illusions that due dilligence conducted by a lender relative to AMS Group LLC would not be done. AMS Group LLC has taken special care to correct the record in this regard by means of the August 2, 2004 letter to Ms. Payne which also states that we have asked her for a copy of the July 16, 2004 letter to the Federal Reserve Bank in answer to our complaint. We aver that JPMC's strategy is evident—i.e., to restate the basis upon which we approached them and thereby vindicate their bad faith dealings with us.

25. However, the irrefutable facts are that AMS Group LLC specifically and exclusively conditioned the application for a loan upon the availability to us of guarantors willing to make available various methods and banking instruments to secure the loan from JPMC. We had and still have at least four different guarantors who are capable of delivering highest quality banking instruments to satisfy the most discriminating lender (in the technical sense). At least one of them guarantees that they will close within 14 days of the issuance of a commitment letter on the part of the bank. The further fact is that AMS Group LLC was gearing up to do business predicated upon the acquisition of a refinery and as such, "income:" and other such "assets" were never at issue either in any written presentation or in any verbal representations. The acquiring of a refinery was the prerequisite to doing business pursuant to Public Laws 99-661, 95-507 and various set aside programs and provisions in Federal

11

Acquisition Regulations, General Services Administration, Department of Defense, NASA, etc., as well as abundant opportunities in the mainstream economy.

26. AMS Group LLC, through and in cooperation with its JV partner, National Oil Company, sought to acquire the refinery and to secure a reliable source of feedstock for the refinery whereby business could be conducted as stated above.

27. As a back up to the strategy of purchasing crude through or in cooperation with its Joint venture partner, National Oil Company, AMS Group LLC advanced proposals to other guarantors to secure oil exploration blocks such as its members had delivered to Occidental Oil Exploration and Production company.

. Current Consultations for P & B Oil and Gas Well, Inc. relative to U.S. oil reserves very favorably assayed by ChevronUSA, Inc. (Excerpts)

28. One of the members of AMS Group LLC is Chief Consultant to P & B Oil and Gas Well, Inc. which owns exploration/production acreage described by ChevronTexaco USA, Inc. as "A sea of oil".

29. AMS Group LLC is, through one of its members, Donald Greaves, is affiliated with D. Carlyle International LLC which is registered with Central Contract Compliance (CCR) through SBA and registered under its Diversity Program with ChevronTexaco USA, Inc.

## CONCLUSION

AMS Group LLC alleges that JP Morgan Chase is in violation of the spirit and letter of the law as set forth in Equal Credit Opportunity Act and Community Reinvestment Act; and that JPMC has acted throughout communications and negotiations relative to the loan application/loan proposal in demonstrably bad faith in violation of the applicable laws with the consequence that AMS Group LLC has been grossly and irreparably damaged by having lost an extremely rare opportunity to acquire a refinery for the purpose of doing extremely profitable business as stated throughout this complaint. As a consequence of these bad faith dealings, the unique and extraordinarily profitable enterprise in which AMS Group LLC had planned to engage, requiring as it did, most

unusual coincidences and favorable confluences of elements, people, opportunities that manifested in critical but fleeting and limited timing—has aborted, at least as most beneficially conceived.

AMS Group LLC maintains that the minimal requirement as evidence of good faith on the part of JPMC which our company sought after initially, consistently and passionately, was an opportunity to meet with and present an array of options, methods, modalities of effecting collateralization of the bank, whereby the bank's expert(s) were invited to inspect, appraise, test the proposed methods and instruments advanced to secure the loan and to ensure, thereby, that the highest principles of safety and soundness would be most carefully observed at all stages of the transaction. By an unmistakable and all too familiar series of acts and omissions, evidencing disinterest, insincerity, even naked hostility, the cognitive process of logic detects that redlining is here in evidence, consistent with the historical findings in kind, against which Equal Credit Opportunity Act and Community Reinvestment Act were positioned for the general public health and wellbeing.

Clearly, it is most evident that since AMS Group LLC claimed to be able to deliver bona fide collateral to secure the loan applied for, the most obvious route to qualifying or disqualifying our company would have meant very simply that we should be invited to a meeting to "put up or shut up". Such a meeting would have served to qualify or disqualify us with indisputability as to the findings of JPMC. Instead of this obvious, and we believe, customary approach that is common to the handling of White businessmen's applications of this nature, every dodge, every evasive maneuver conceivable was employed by this lending institution whose posture vis a vis Black owned and controlled businesses has been thus revealed to be at variance with the law and the certifications

made to the OIS, FRB, etc. are proved¹³ false. It is clear from the most recent audits relative to compliance with CRA which we have minutely examined in comparative study also of its Annual Report, that holes and inconsistencies exist, the curing of which no serious effort is being made by this bank and, we dare say, such antithetical attitudes continue industry wide. Indeed, even as JPMC—improperly!—suggested, (and Federal Reserve Bank's Examiner, Ms. Muriel Payne, curiously echoed), we did, in fact "go elsewhere" and we met with what is essentially the exact insincere treatment, specious and disingenuous excuses, dodges, evasive maneuvers that history has identified and condemned as unfair, un-American and, now, illegal as per Equal Credit Opportunity Act, Section 202.9 generally, providing for "Notification" with specifics as to bases of denial of a loan within 30 days. JPMC received our application on 3/16/04 and returned their final response of rejection, only to the Federal Reserve Bank on 7/16/04 (Four Months Later!) when all possibilities of our doing the hard business, years in planning, had disintegrated, along with the disappearance of the only two highly coveted refineries that were the foundation of our plans.

For these reasons, AMS Group LLC demands to be made whole pursuant to a jury trial for damages, compensatory and punitive, in the amount of one billion dollars ($1,000,000,000.00) and any other relief which the Court may find just and proper, including "specific performance" of its obligations to provide funding on safe sound principles as dictated by the social contract defined by ECOA and CRA.

- 14 —

The foregoing compel the following questions:

1. Why did J P Morgan Chase V.P. Nicholas refuse (a) to meet with AMS Group LLC members or representative and guarantors and/or (b) allow a teleconference with them, following AMS' application submitted on 3/16/04?

2. Why did J P Morgan Chase on 4/23/04 require refinery financials and description of loan mechanics yet at the same time—4/23/04—apparently even before receiving them!—tell Park Avenue Equity Partners that JPMC would not lend to AMS Group LLC?

3. Why did JPMC take 4 months to reject the AMS Group LLC application if they told Park Avenue Equity Partners of their rejection on 4/23/04?!

4. Why did J P MC tell Park Avenue Equity Partners of intentions to reject AMS Group LLC's application <u>before</u> telling AMS Group LLC?

5. How are similar applications by White owned and controlled company executives handled, treated?

6. Why was there absolute, unconditional refusal to cite "defects" and "deficiencies" of the AMS Group LLC loan application, whereby they could easily have been cured? Why did V.P. Nicholas vehemently declaim: "I don't have to tell you why! That's just the way it is, and that's the way it is going to be!"

7. Given the AMS Group LLC letterhead and the ease with which they could have been adjusted, what is the reason for the bank's "grasping at straws" relative to administrative details, such as telephone number, address for business, authority to do business in New York.

8. Why did not the exactly same category of bank—Citibank, N.A., to which "competitor" JPMC strangely sent us!—make the same demands? (Note: For a detailed description of the brush off technique employed by Citibank, N.A., see correspondence directed to Citibank officers, beginning with Executive office.)

9. Indeed, why did not Citibank give AMS Group LLC a letter of rejection like JPMC, albeit, hopelessly late?

10. How do White owned and controlled applicant enterprises compare in treatment received relative to each of these questions?

11. Exactly what was the dialog between JPMC's V.P. Mr. James Nicholas and Park Avenue Equity Partners' Mr. Scott Booth, according to their respective depositions?

12. Did Park Avenue Equity Partners require Bank contacts of other prospective buyers of the refineries?

13. How many minority firms have applied and how many have been approved by J P MC for comparable loans in the last X years?

14. In contradiction of the spirit and process of "due diligence" why were our repeated offers to deliver for the bank's examination Certificates of Deposit and/or other instruments to secure the loan steadfastly refused?

15. Why were not the curricula vitae of the company membership examined, including as they do (a) evidence of delivery of a 300,000,0000 bbl oil block to the largest independent oil company in the world; (b) delivery of a one billion dollar irrevocable letter of credit to an oil producing country's energy agency;

- 16 -

Letter of Intent from Texaco, Inc., prior to merger with Chevron USA, Inc. for Purchase of up to one million tons of 40 cetane diesel/heating oil (fungible fuel); Purchase orders from Delta Airlines for aviation kerosene Jet A (jet fuel); Negotiator with government of Viet Nam for drilling rights in the South China Sea and 30 year veteran Wall Street Commodity Exchange trader; contractor for fuel supply to City of New York by former comptroller of E D & F Man, etc., etc.

According to Aristotle "To know what to ask is already to know half."

In the event a settlement of $1B cannot be attained, then, calculating conservatively:

A term contract of, say, 36 months, spanning 2005 to 2008 = 3,000,000 bbls/month x $40/bbl x 36 months = Four billion three hundred twenty million dollars ($4,320,000,000.00).

Note 1: We use $40/bbl to anticipate any unlikely, but possible precipitous declines in the current per barrel price of $60+.

Note 2: Again, conservatively, we use 36 months (3 years) instead of 48 months (4 years).

Note 3: Utilizing a slightly less conservative barrel price of $50 produces Five billion four hundred million dollars ($5,400,000,000.00l).

- 17 -

Factoring in the cost to the Plaintiff for purchase of refinery, purchase of crude, transportation, refining, marketing and contingencies, still, the net profit to the Plaintiff would have been highly significant over time, making the proposed settlement reasonable, indeed.

Although the proposed (Crown) Pasadena refinery capacity was 100,000 b/d, there may also have been opportunities to sell portions of the total monthly shipment of barrels and/or to farm some portions out to other refineries pursuant to processing agreements.

Thus it can be seen that a one billion dollar settlement ($1,000,000,000.00) would be most advantageous to both the defendant and the courts alike, given the fact-laden inarguable merits of the case for the Plaintiff, AMS Group LLC.

Dated: August 3, 2007
Brooklyn, New York

Respectfully submitted,

Per Diem Attorney of
PIEDRA LEGAL SERVICES
810 Ritter Place, Apt. 5C
Bronx, New York 10459
(718) 924-5504