Case 1:07-cv-06988-LTS   Document 36-2   Filed 05/01/2008   Page 1 of 15



Exh A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMS GROUP LLC, DONALD GREAVES, and SAINT
CLAIR JACKSON,

                  Plaintiffs,

        Vs.

J.P. MORGAN CHASE, INC.

                Defendants
-------------------------------------------------------------X

Civil Action No.:
07-CIV 6988 (LTS)

DONALD GREAVES
AFFIDAVIT

I, Donald Greaves, hereby state that the following is true to the best of my knowledge and understanding, except those statements that are based upon information and belief, of which I believe are true. I further understand that all of the statements below are subject to the penalties of perjury. I, hereby state the following;

1. I am a principle and founding member of the defunct company AMS group LLC.

2. I, Plaintiff Saint Clair Jackson, and other partners formed AMS Group LLC, for the purpose of purchasing an oil refinery located in the Gulf Coast of the United States.

3. In March of 2004, as a principle of AMS Group LLC, I applied for financial backing from J.P. Morgan Chase to fund the deal to enable purchase of the aforementioned oil refinery. The deal was based upon third party guarantors with whom we were negotiating and upon their assets.

4. My application letter was submitted with extensive information and details concerning the purchase deal, in particular, the refinery financials which Chase required we deliver to them, together with background information including letters of interest/intent from

Texaco, Inc., Delta Airlines Purchase Orders, Occidental International Exploration and Production Company letters, etc. It also contained requisite contact information in case Chase had any questions or requests for additional information.

5. The letter clearly stated on its face that it was an application, and we have never received any correspondence from Chase that it was otherwise.

6. Further, Chase did not offer, nor demand that we fill out any other forms with respects to my application, and it was our information and belief that the documents that I submitted were adequate.

7. Whenever I inquired about the status of the application, it was my understanding that the application was being investigated and reviewed.

8. More than thirty days had past after submitting my application and there was no response to me or any one on behalf of AMS Group LLC concerning the application.

9. I first learned that Chase was not going to approve the loan from the owners of the oil refinery via email, which I confirmed by telephone. No reason for denial was ever given to me by any employee at Chase and when I requested the reason or reasons, I was explicitly told: "I don't have to give you a reason. We're just not going forward with the deal. That's the way it is and that's the way it is going to be."

10. I was not given the opportunity to cure any potential deficiencies in the application, because Chase never bothered to even inform me that there were any. They refused to specify the reason(s).

11. Chase never replied directly to us, but, rather, replied by letter to the Federal Reserve which forwarded the belated alleged reasons for denying the loan and refusing to discuss the alleged deficiencies.

12. Each of the belated alleged reasons alleged for denial could have been cured readily, (had Chase followed ECOA procedures).

13. I believe that Chase harmed AMS Group LLC, myself and others consequently:

   A:  by failing to properly notify us of the basis for denying the loan as required by law.

   B:  by improperly communicating to the owners of the refinery details of our loan application, causing the oil refinery owner to sell the refinery to a competitor to which they made an unsecured loan of $65,000,000.00 (the approximate asking price of the same refinery for which AMS Group was bidding.

   C.  by discriminating against my and our endeavor based upon the color of my skin which was evident by the nature of our conversation wherein the bank's representative protested: "I'm not going to put history on the back of my company"—when I complained that our experience with the bank was suggestive of the histoical pattern of exclusion from equal opportunity in the capital markets

   D.  denying all plaintiffs the enormous financial benefit of a one in a life time deal had this purchase gone through.

12. After not receiving the proper treatment from Chase, I submitted a complaint to the Federal Reserve Board.

13. To my knowledge, the Federal Reserve Board did contact Chase and demanded that Chase issue the reason and basis for not going forth with the loan.

14. Chase submitted its written letter to the Federal Reserve Bank, its alleged reasons for denying the loan only after approximately 90 or 120 days had passed, instead of 30 days.

15. Neither the Federal Reserve Board nor Chase forwarded that letter to me 90 to 120 after the application was submitted to the bank and neither the Federal Reserve Board nor Chase informed me of the next steps, specifically, the right to sue and the time limit that applied, although they had sent us the pages defining 202.9a and 202.9b re: time limit for bank to respond and requirement that specific reasons be given where action is adverse. We had absolutely no idea of the statute of limitations section, and took 3 years to be the applicable limit as per normal business matters.

16. My understanding of the Federal Reserve Board process is that our issues would take some time to be thoroughly investigated and that we would be provided all necessary information to seek relief.

17. The loan application and the complaint to the Federal Reserve Board was conducted without legal counsel, however, I contacted a number of politicians and government representatives in order to resolve the matter—most notably, the members of the (Congressional) House Financial Services Committee because they have oversight over the Federal Reserve.

18. The Federal Reserve Board have not issued any findings to date, nor did it inform me of the next steps that could be taken to obtain relief. They acted strictly on behalf of Chase in conveying the bank's position exclusively.

19. I respectfully pray that this court deny the Defendant's motion to dismiss based upon the Statute of Limitations, because;

1) I am not an attorney and I was not represented by one during the entire process.

2) I was led to believe that the Federal Reserve Bank was a supervising bank that would resolve the matter.

3) The Federal Reserve Bank did not inform me of other remedies and I was not aware of any until the summer of August 2007, when we filed the complaint in Federal Court, pursuant to the understanding that this was a business matter where 3 years is the common rule. Accordingly, since the Chase position was not delivered to us until August 2004, we took August 3, 2007 to be the three year limit that applies to most business matters. The company having been dissolved as a result of the disaster with the refinery and the bank, we were without means to retain counsel to pursue the matter earlier on.

4) The Defendants are partly the blame for the Statute of Limitations issue, because they if they had complied with ECOA which includes informing us of the proper remedies; we would have known that time was running out for a lawsuit in Court.

5) Because we only recently (within the last 4 months, approximately) discovered that Chase had made an unsecured loan to a competing bidder for the same refinery we were bidding for, we believe the court should allow this matter to proceed, since the Chase posture of foot dragging and refusals to comply with ECOA suggest that the business was wrongfully redirected from us.

6) The Defendants have not articulated any prejudice to themselves if this court would allow the matter to go forward.

Dated: April 30, 2008

*(signature)*
Donald Greaves

*(signature)*
Notary Public
Robert Parker

NOTARY PUBLIC
State Of New York
Reg. No. 02PA6133122
Expires Sept. 12, 2009

NOTARY PUBLIC
State Of New York
Reg. No. 02PA6133122
Expires Sept. 12, 2009

Exh. B

138 Madison St.
Brooklyn, N.Y. 11216
Tel. 718 909-5942  Fax: 718 636-5164
Email: etawfs@email.com

20

Certified Mail Return Receipt Requested

March 16, 2004

Mr. William B. Harrison, Jr.
Chairman and Chief Executive Officer
JP Morgan Chase
270 Park Avenue
New York, N.Y. 10017

Dear Mr. Harrison:

Please consider this letter an application for a loan pursuant to the letter and spirit of the Community Re-Investment Act (CRA), enacted by Congress in 1977 (12 U.S.C. 2901) and implemented by Regulations 12 CFR parts 25, 228, 345, and 563e.

Since re-opening an account with Chase at 5 World Trade Center about 1998-99, I have been banking with Chase again (account #681022515965);but in 1991, we opened another personal account at your 14th St. and Fifth Avenue location in order to do the business referenced below from the company then known as Texaco, Inc., before its merger with Chevron USA, Inc. That business called for a trade contract of approximately one million tons (840,000) of fungible fuel per year for at least one year. The idea was to open the personal account and convert or add a business account as soon as certain elements of the business were put into place. At that time, Mr. Steven Skrobala---who has since become a Vice President--was the account representative and we learned from him that Chase has an energy trading department.

Texaco's crude oil and products managers at the time (Mr. James Harvey and Dennis Denihan) advised me in the course of our negotiations that they would purchase product from me even more extensively if I owned a refinery which they learned was also an objective of D. Carlyle International, Inc., our company at the time. However, although Small Business Administration's Assistant Director, Ms. Georgia Ellis at 26 Federal Plaza, New York City, approved my company for a refinery business plan, of which that office commissioned the creation, it developed that my fledgling company was unable to align necessary finances and other elements of the business timely.

Thus were we unable to do the Texaco and other profitable business available through SADBUS (Small and Disadvantaged Business Utilization Specialists) of the various governmental agencies such as Department of Defense which, through Public Law 99-661 had set aside $20 billion from the then $325 Billion military budget. Nor were we able to serve the purchase orders we had laboriously secured from Delta Airlines, only one of which is attached. Without our own energy company, per se, we nonetheless succeeded in arranging for Oxy's (Occidental International Exploration and Production Company's) acquisition of an extremely productive oil exploration block in West Africa containing significant reserve estimates, now producing at the rate of approximately 50,000 bpd.

Chevron Texaco USA, Inc.'s Ms. Audrey Goinsbrichi awaits our return to access the sub prime contracting opportunities, upon which we were unable to follow through in the past, principally for the above stated reasons. Additionally, we shall readily obtain D.O.D. contracts as Prime Contractors ourselves now. Further, we shall exploit the super abundant opportunities available through 95-507 (General government contracts), creating many new jobs for an highly significant number of people.

- 2 -

In recent years the Congressional Black Caucus, in concert with other progressive thinking and fair-minded members of the general Congress have succeeded in increasing the set aside goals to $36 Billion from the D.O.D. budget alone. The CBC was the driving force in the creation of the original set aside legislation—e.g., 99-661—and we enjoy the support of the CBC, most notably Hon. Charles Rangel who wrote to us and the Hon. Parren J. Mitchell who personally called and wrote to us his expressions of congratulations and support of our work to achieve compliance by the major oil companies. MBEL-DEF (Minority Business Enterprise Legal Defense and Education Fund) was founded by former Congressman Mitchell and continues under the Direction of attorney Anthony Robinson who worked with us from the beginning.

By the Grace of God, there is now the total alignment of the elements that were either absent or out of place when our quest began in 1988-1991; to whit:

A. I am part of a group of extraordinarily capable, highly experienced associates with extensive energy industry and finance backgrounds.
B. We have identified a refining facility, complete with adequate storage capacity, logistically located near a water port and oil pipelines. It is perfectly suited to the business now awaiting us, requiring only $60 million dollars to acquire with additional funds required for upgrades and maintenance, replacement cost is estimated to be significantly higher.
C. We are supported in these updated plans and endeavors by financial partners prepared to supply the security for the loan which, hopefully, J.P. Morgan Chase will provide forthwith, given that we are providing the security to minimize risk and liability for J.P. Morgan Chase.
D. We have the downstream elements aligned, including acquisition, refining and marketing.

The refinery (100,000 Bpd) with its storage and other facilities is being looked at with keen interest by competitors, which is the basis of some concern and the driving impetus for our moving expeditiously. Accordingly, we will call your office in hopes of scheduling a meeting with you and/or your representative(s) and we extend our gratitude in advance for your timely acknowledgment of this letter via our contact information provided on the letterhead above.

Certification is, herewith, provided to document our status as Minority owned and controlled.

Yours truly,

*[signature]*

Donald C. Greaves
Associate Director


Cc: Honorable Charles Rangel, U.S. House of Representatives
Cc: Mr. Herman "Denny" Farrell, Chairman, New York State Banking Committee
    & Chairman, New York State Democratic Committee
Cc: Mr. Anthony Robinson, Esq., President, MBEL-DEF, Minority Business Education Legal Defense and Education Fund

Attachments

**AMS GROUP LLC**
138 Madison Street
Brooklyn, N.Y. 11216
Tel. 718 909-5942 Fax: 718 636-5164
Email: etawfs@email.com

2-1

April 13, 2004

Mr. James Nicholas, Vice President
Auditing
J.P. Morgan Chase
270 Park Avenue
New York, N.Y. 10017                    Via fax: 212 383-0233

Dear Mr. Nicholas:

We appreciate the timeliness of your response to our letter of March 16, 2004 addressed to Chairman Harrison. We reiterate our position which I briefly indicated to you, that your remarks were most encouraging in that we are prepared to meet the criteria which J.P. Morgan Chase requires in order to become involved with refinery construction and/or acquisition projects in context of appropriate existing loan/investment programs. It happens that prior to your call, we were prepared for this eventuality based upon deeper study of the Community Reinvestment Act, and consultation with regulators at the Federal Reserve Board, revealing that "safety and soundness" are the overriding and guiding principles of loans made pursuant to the CRA. We had therefore decided that—in advance of J.P. Morgan Chase's response—it would be prudent to deliver the following overview of the transaction and the subject secured loan in keeping with those principles.

Accordingly, we submit for your consideration Accordingly, we submit for your review the terms whereby the proposed loan would be secured by the provision of Bank Warrant from an institution carrying a rating of AA, Aa or better. This warrant is a direct bank obligation that is not marketable or transferable, not to be confused with "tradable" or "discounted" securities with less efficacy. After project funding is approved and development has commenced a second warrant will be issued to guarantee the performance on the agreed upon project drawdown schedule for the AMS, LLC project.

*Refinery Acquisition/Upgrade Project :*
    *A Project funding utilizing <u>a bank warrant to secure an approved loan</u>.*

The funding required for the project is $135,000,000 with a minimum of $100,000,000 required for the utility of the bank warrant facility. The project dynamics are as follows: (1) Acquire the subject refinery at a cost of approximately $60 Million USD and (2) perform immediate maintenance, retrofitting, at an additional expense of approximately $75 million USD.

Suggested Basic Procedures:

A) J.P. Morgan Chase will review the warrant sample text, and when the language is satisfactorily agreed upon, JP Morgan Chase approves funding of the project;

B) J.P. Morgan Chase creates an account in the name of AMS Group LLC to hold project funds and confirms the availability the funds to the bank issuing the warrant

- 2 -

C) The warrant is then sent via swift to the project account at JP Morgan Chase.

D) J.P. Morgan Chase completes the normal and standard due diligence with regard to the warrant, prior to release of the funds for the project implementation.

A key objective of this letter is to provide you with an overview of the utilization of the bank warrant facility as a vehicle that will significantly reduce risk to J.P. Morgan Chase. Further, AMS Group LLC proposes to sustain the commercial relationship after funding and acquisition for the purpose of operational and trade finance commercial banking.

We hope this adds more clarity to our proposal toward acceleration of discussion with an in-person presentation of documentation to effect a timely decision as a unique but fleeting opportunity awaits us.

Sincerely,

Donald C. Greaves

Associate Director

Attachment::   Bank Warrant Sample Text

**AMS GROUP LLC**
138 Madison Street
Brooklyn, N.Y. 11238
Tel. 718 909 5942 Fax. 718 636-5164
Email: ctawfs@email.com & amsllc@adelphia.net

22

April 22, 2004

Mr. James Nicholas, Vice President
Auditing
J.P. Morgan Chase
270 Park Avenue
New York, N.Y. 10017

Dear Mr. Nicholas:

As per our telephone conversations, herewith, documents you requested in order to assess our loan application.

We have attached a copy of today's email transmission from Mr. Scott Booth of Park Avenue Management LLC, 399 Park Avenue, Suite 3204, New York, N.Y. 10022 Tel. 212 430-0143. They are commissioned by Crown Central Petroleum to market the subject assets.

He expresses an interest in speaking directly with "any banks that you are working with" and he advises us that "time is of the essence" as other prospective buyers abound.

Sincerely,

Donald C. Greaves
Associate Director

Attachments

Exh C

**AMS GROUP LLC**
138 Madison Street
Brooklyn, N.Y. 11216
Tel. 718 909-5942  Fax: 718 636-5164
Email: amsllc@adelphia.net

27

April 30, 2004

Mr. James Nicholas, V.P.
Auditing
J.P. Morgan Chase
2 Chase Manhattan Plaza
New York, N.Y. 10005

Subject: Confidentiality

Dear Mr. Nicholas:

This purpose of this letter is to recapitulate the explicit terms of "Confidentiality" emblazoned upon the cover of our proposal titled: "Summary Plan For The Acquisition and Operation of Crown Central Petroleum Corporation's Texas Refinery", together with preliminary materials you received directly from Chairman William B. Harrison, Jr.'s office, which were initially addressed to him. It is implicit by the very nature of the information shared in discussing a relationship between banking institutions and potential clients that all information and documents remain strictly confidential. It is important memorialize that your institution is bound by the tenets, terms and conditions of the Confidentiality Agreement executed between AMS Group, LLC and Park Avenue Equity Partners, LLC, with regard to the sale of the assets of Crown Central Petroleum Corporation.

Accordingly, please also advise your Executive Office of our concerns in this regard, and that industry standards be carefully observed and particularly in view of your company's rejection of our application for funding of the refinery acquisition project.

Thank you.

Sincerely,

Donald C. Greaves
Associate Director

CC: Board of Members / AMSGLLC