UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

AMS GROUP, et al,

        Plaintiffs,

VS

JP Morgan Chase, Inc.

        Defendants

-------------------------------------------------------------x

Civil Action No.
07-CIV 6988 (LTS)

DONALD GREAVES
<u>AFFIDAVIT</u>

**COURTESY COPY**

I, Donald Greaves, hereby state that the following is true to the best of my knowledge and understanding, except those statements based upon information and belief, which I believe are true. I further understand that all of the statements below are subject to the penalties of perjury. I hereby state the following..

1. I am a principle and founding member of the defunct company AMS Group LLC.

2. I, Plaintiff Saint Clair Jackson, and other partners formed AMS Group LLC for the purpose of purchasing an oil refinery located in the Gulf Coast of the United States of America..

3. In March of 2004, as a principle of AMS Group, on behalf of the company

      and my partners, I applied for a secured loan to purchase the refinery which was made known to Saint Clair Jackson by virtue of extraordinarily high quality contacts.

      Although time was of the essence in the bidding process for the refinery the bank (a) did not comply with the 30 day rule as required by ECOA. (b) Refused to specify reasons for adverse action for 90-120 days.

3. The bank required us to give them (a) our Business Plan and (b) the Financials of the refinery in order to process our application.

4. The refinery needed to know that we were actually in contact with finan-cial sources in order to seriously consider our bid and advised me that they must have the name, contact, tel. no. of any banks we were talking to.

5. We were compelled to introduce the parties in this circumstance and we had every legal and ethical basis for reliance upon business ethics, norms, standards, law to prohibit malicious communications wherein the understanding was clearly that contact was being permitted solely for the purpose of "verification"  as stated in the email to me from the refinery.. (Exhibit A. Email).Chase told Booth before telling us of loan denied.

6. Since the bank demanded to see the financials of the refinery and the refinery demanded to contact the bank, the bank exposes its bad faith in falsely accusing me of violating confidentiality with the refinery.

7. We applied to Chase for various reasons including the simple fact that two of our company's members banked with them for years.  Indeed, to this very day I have both personal and business accounts with Chase.

8. On June 12, 2008, my new company, D. Carlyle International LLC applied to Chase for a secured loan of forty million dollars ($40,000,000.00) in order to Joint Venture with a group that owns land on which extraordinary reserves of oil and gas have been found. I have been acting as a consultant for the group for the last 1.5 years. (Exhibits  B, C, D, E.)

9. In 2004 as now, we could have delivered guarantors capable and willing to provide the collateral necessary to secure the subject loans.  We were not allowed to do so then.  I am hopeful of being granted that opportunity in the .present circumstance as the result of transparency created by this case.

10. Ironically,  due to Chase's past nonperformance in accordance with ECOA, I now have an opportunity for ownership of crude oil production and have no refinery when vertical business integration is the ideal model.  (Exhibit F)

11. I obtained offers from Texaco to buy nearly one million tons of fuel from any source I could provide, including any refinery I owned.  I also have purchase orders from Delta Airlines to purchase jet fuel. These letters demonstrate rare entrée and access to companies which  have always assured me they would buy if I had a refinery. (Exhibit G, H, )

14. I have letters from Occidental International Exploration and Productions Company acknowledging me as associate of the geologist who confirms the findings of major oil company geological studies relative to the land

      owned by the group I have been consulting for during the last 1.5 years. Such documents show that my work in the energy field has been substantial over time. (Exhibits I, J). This also evidences merit.

15. In 2004 we had numerous financial backers capable of delivering collateral to secure the loan we applied for. (Exhibits K, L, M, N, O,. emails from and between Motley and Forde, ; World Business Capital program; Conley Global Consulting Group; and Michael Murphy Affidavit.),

16. A former Vice President of a well known bank is currently partnering with another company I formed since AMS' dissolution. She is working with D. Carlyle International LLC to provide finance for various projects and she has guaranteed that she could and would deliver financiers to secure loans for both the oil drilling project and for the building of a refinery in South America. She was recently honored by !00 Black Men for her stellar achievements. This fact demonstrates a current ability that is consistent with the capability we claimed in 2004 wherein Chase refused to let us in the door to discuss their requirements, preferring to sabotage our business with Crown Central Petroleum refinery representatives, Park Avenue Equity Partners (Scott Booth and William Nesbit).(Exhibit E Request For Collateral from a funding source relative to new loan application to Chase).

17. The Securities Exchange Commission report (10Q), showing that Chase made an unsecured loan to a competing bidder for the same

      refinery we were considering, for approximately the same amount, strongly indicates that Chase may have been dragging their feet relative to our loan application because of this conflict.. Discovery will reveal a five year loan from Chase to our competitor for $65,000,000.00, the amount of the refinery asking price, approximately, signed by Crown's V.P of Refining, Trembly on September 1, 2004.

18. We have been told by the Human Resources Department of Chase that the Vice President, Mr. James Nicholas (the Comptroller). is no longer in New York but has moved to a Chase branch in Texas, which is the state where the refinery is located, formerly owned by Crown, now financed by Chase.

19. Mr. Scott Booth of Park Avenue Equity Partners (the representatives of the refinery) is no longer with Park Avenue Equity Partners, according to a woman I spoke with in that office.

20. Just as we are required to give this testimony under oath, we pray that that this court will require that other principal actors in these matters also give testimony under oath, pertaining to the nature and extent of their communications relative to AMS Group LLC and to us.

21. I recently contacted API (American Petroleum Institute) for information on refineries available for purchase and was referred to Mr. Randy Trembly. (281 286-1274) who, by extraordinary coincidence, happens to be the

former Vice President of Refining for Crown Central Petroleum's refinery at Pasadena, Tx. According to him, the numbers we had used were too low in calculating our losses in losing the refinery. He said that earnings per barrel of crude ranged from $3 to $8, so that $5 was a fair average. Thus one and one half billion dollars $1,500,000,000.00) would be the gross earnings, we believe, for the 4 years in question (2004-2008). Our attorney advised us that an interrogatory under deposition would discover pertinent facts supporting our claims:

22. The Complaint we filed on 8/3/07 stated that one billion dollars $1,000,000,000.00)was the amount of loss. However, Mr. Trembly's expert opinion corrects this. If Chase refuses Alternative Dispute Resolution as the court's 8/31/07 Initial Pretrial Conference Order seems to allow, then we shall consider amending our complaint to restore the damages in accordance with this expert witness, from $135,000,000 + $500,000,000 to $1,000,000,000 as per our original complaint filed on 8/3/07.

23. On or about 2/10/08 in the a.m. by phone, I asked Mr. Trembly if he would appear in a court matter as an expert witness. He replied that he would "testify in response to a subpoena.".

24. According to a 10Q SEC Report, on September 1, 2004, JP Morgan Chase ("Chase") became the "Documentation Agent, Arranger, and Joint Book Runner" in a sixty five million dollar loan ($65,000,000.00) to a competing bidder for the Crown Central Petroleum, Inc. refinery. This sum is consistent with the asking price of $60,000,000.00 for the refinery

      which was the basis of our loan application of $135,000,000.00 wherein, $60,000,000.00 was to be for the purchase of the refinery and $75,000,000.00 was for retrofitting, sour tower conversion and general rehab of the facility we were advised was in need of repairs. Contrary to defendant's false allegation about "fishing expeditions", we seek very specific, limited discovery to prove the allegations of our complaint.

25. In 2003, I joined with extraordinarily capable partners who shared my multiyear quest for opportunity to do significant business in the energy sector. Our aspirations, our efforts, our labors were trashed by the illegal conduct of the bank which (a) delayed illegally in answering; (b) refused to tell us how we could cure the "defect(s)" of our application for approximately 120 days instead of 30 as ECOA requires; © maliciously told the refinery before telling us that they were denying the loan, even while pretending to treat us fairly by requiring our Business Plan and the financials of the refinery...(Exhibit P, email from Refinery re: Chase).

26. We have carefully considered each and every argument made by the defendant and have refuted each one in BOLDFACE CAPS. (Exhibit Q) in Defendant's May 13, 2008 Reply Affirmation, they allege that we are not specific regarding "discovery". This is false. We want to question under oath: (a) Booth; (b) Nicholas; (c0 Crown Refining V.P. Trembly; © Chase Chairman Harrison; (d) Delek's Trammel; (e) Phone companies.

27. On the basis of equity and fairness, and because we had no legal counsel

early on and because we appealed to Federal Reserve (a quasi governmental body) and we appealed to House Financial Services Committee (which has oversight) for relief and received none, nor any notice of deadlines for filing a lawsuit, we appeal to the court to allow the case to either go forward in court by trial or find in our favor by Summary Judgment. We appealed to 8 members of the HFSC (with Oversight re: Federal Reserve Bank), including Chairman Barney Frank. From first appeal to now, with phone calls in the interim, we sought help.. (Exhibits Q, R, S, T, U.V,W, X). Also, the letter to Federal Reserve Bank is dated May 7, 2004. I call special attention to the fact that the letter to HFSC Chairman Frank, dated May 7, 2004, was actually faxed to HFSC on May 10, 2004 at appealing the Federal Reserve Bank's uncooperative response.

. 28.  For the above stated reasons, and also because it may be impossible to determine the merits of either side, plaintiff or defendant, without a full, fair hearing, we pray that the court will, in its Summary Judgment, ,either find in our favor that our rights have been violated under ECOA, and under Tortuous Interference with Business Relationships—granting appropriate damages or that the court will grant the jury trial as per the original complaint filed 8/3/07.